## In re THOMPSON.

## No. 5968.

District Court, W. D. Louisiana, Monroe Division.

May 18, 1939.

C. T. Munholland, of Monroe, La., for petitioning creditor.

R. H. Oliver, Jr., and Dhu Thompson, both of Monroe, La., for defendant.

DAWKINS, District Judge.

Creditors of Clyde C. Thompson, Jr., filed this proceeding to have him adjudged an ·involuntary bankrupt. The grounds alleged were that, while insolvent, he (1) transferred and removed, and permitted to be conveyed, transferred and removed, or concealed property and money exceeding $5,000 in value, with the intent to hinder, delay, and defraud his creditors; and (2) paid one creditor ·with the intent to prefer it over others. The acts of bankruptcy were denied and the matter was sent to the Referee, who heard the case, found the facts and has recommended the defendant be adjudged bankrupt upon the first ground only.

Defendant has sought review but concedes that the findings of fact are substantially correct, and complains alone at the conclusions of law. I therefore adopt and quote the findings of fact as follows:

"Clyde C. Thompson, the defendant, has operated under the trade name of Thompson Motor Company in the town·of Delhi, La., since 1937. He was engaged in the retail business of selling automobiles, both new and second-hand. He entered into an agreement with the Commercial Credit Company, Inc., domiciled in the City of Baltimore, Maryland, and doing business in the State of Louisiana, whereby the Commercial Credit Company, Inc., hereinafter called the Credit Company, financed new automobiles purchased from the wholesale distributor, George Morris, Inc. of Shreveport, La. The Credit Company paid George Morris, Inc., cash for the automobiles and assumed ownership thereof, and thereupon delivered the automobiles to defendant, taking from him a trust receipt covering said automobiles. In addition to the trust receipt a note was executed by defendant for the amount which he owed the Credit Company on account of the transaction, which sum was to be paid in cash when the car was sold. Under the trust agreement ·the defendant obligated himself to hold said cars in trust for the Credit Company as its property and agreed to return all or any of said cars in good order, complete and unused, upon demand, and to immediately deliver the proceeds from the sale of any of said automobiles in cash to the Credit Company. The trust agreements, P-1, P-2, and P-3, are made a

part of this opinion by reference, and are not quoted in full, but cover eight cars hereinafter referred to. More than forty automobiles were handled under a similar agreement from September 11, 1937, until February, 1938. The agreement required the proceeds of sale of any automobile to be paid to the Credit Company in cash. However, it was the practice of defendant to sell the automobiles for a small cash payment, and to require the purchaser to execute notes secured by chattel mortgage on said cars. The chattel mortgage and ·notes would usually be forwarded to the Commercial Credit Company or Motors Securities Company, accompanied by a draft for the amount of the notes transferred. The Credit Company, if it accepted the loan, would ·honor the draft. Defendant did ·a large volume of business for a dealer in a small town. He took in second-hand cars in part payment for new ones, which second-hand cars he then sold on credit and they were financed in the same manner as the new ones. The record discloses in a general way that bankrupt's expenses and losses were exceeding his profits and he was behind with his payments to the Credit Company as well as with other creditors. On November 30, 1937, there were purchased from George Morris, Inc., under the trust agreement referred to, one Plymouth Sedan, $581.66 (P-1, P-66). On December 18, 1937, a similar purchase was made of two Plymouth Sedans, $637.00 each, and one Plymouth Coupe. .(The coupe was sold and paid for, when sold (P-2, P-66) and is not further considered.) On January 27, 1938, four Plymouth automobiles, two valued at $658.00 each, and one valued at $637.00 and another at $582.00, were purchased under the trust agreement (P-3, P-66). The totals of the amount due for these purchases, less the coupe, amount to $4,390.60 (P-66). These automobiles were sold by the defendant on credit but the notes and chattel mortgages were delivered to the Motors Securities Company, Inc., a different finance company, and the money therefor received by defendant. Defendant failed to pay for the cars, which he held under the trust agreement (P-1, P-2, P-3) out of the proceeds of the sale thereof. The Commercial Credit Company was not advised by defendant that these automobiles had been sold.

"On January 6, 1938, and again on January 22, 1938, A. T. Schoolfield, an employee of the Commercial Credit Company,

visited defendant's place of business in Delhi. He found on the floor of defendant's place of business automobiles, serial numbers 20010355, 20006184 and 9099488 (P–1 and P–2) (less coupe). These cars appeared to be unsold as they were apparently unused and without license tags (P–46–47). Defendant made no remark that would lead Schoolfield to believe said cars had been sold. However, chattel mortgages recorded on February 5, 1938, and other evidence disclosed that R. C. Dolley, a salesman of defendant, purchased car 20010355 on December 17, 1937, for a recited consideration of $1110.56, with a deferred balance of $795.36. and that car 9099488 was sold to E. C. Donald on December 4, 1937, for a consideration of $956.06, which mortgage was recorded February 5, 1938. Car 20006184 was originally sold to Julian Thompson, brother of defendant, and resold to Sam Reisor on January 25, 1938. It appears from the record that J. S. Thompson had bought the car on December 20, 1937, but the contract was not recorded. All of the seven automobiles, according to the records, were sold and were financed through the Motors Securities Company. On February 4, 1938, representative of the Commercial Credit Company, Mr. Schwaner, called on the defendant to obtain settlement and at that time found none of the automobiles on the floor. The defendant refused to give him any information as to the whereabouts of the seven automobiles or the disposition thereof. The record discloses that Mr. Kidwell, office manager of the Monroe branch of the Commercial Credit Company, likewise called on Mr. Thompson February 4, 1938, and Mr. Thompson declined and refused to give him any information about the cars or what disposition, if any, had been made of them. Mr. Wilson, Regional Credit Manager, located in Memphis, Tenn., accompanied by Mr. Schwaner and Mr. Kidwell, visited the bankrupt at Delhi, and attempted to obtain definite information about the disposition of said automobiles. Mr. Taylor of the Credit Company, and Mr. Lawrence, Manager of George Morris, Inc., of Shreveport, likewise visited Mr. Thompson, and he refused to disclose to any of them what had been done with the automobiles. The chattel mortgages covering these cars had not been recorded on February 4, 1938, and of course the public record revealed no information. All of these sales were recorded in the Clerk's office, Rayville, La., on February 5, 1938, except one, which was recorded February 19, 1938. On February 10, 1938, counsel for Credit Company checked the records of the office of the Clerk of Court at Rayville, La., and for the first time it was learned that the seven above described automobiles purchased under the trust agreement had been sold (P–1, P–2, P–3, less coupe).

"Defendant in his testimony explained that the attitude of the representatives of the Commercial Credit Company was dictatorial and that they exercised authority which he did not think they had a right to assert by taking possession of automobiles, etc., and that he was told by one of them that unless he made settlement for the missing automobiles that either the attorney for the Credit Company or the District Attorney would be over to see him. A great deal of the testimony taken in this case will be of no help to the Court in deciding the issues, and is, therefore not set out in the finding of facts but all evidence considered pertinent to the issues is embodied herein.

"On February 3, 1938, defendant deposited $959.79 in the First National Bank in Delhi. The statements, Exhibit D–25 to D–31, cover deposits, and checks drawn against the account, and are supported by the bank statements and cancelled checks, drafts and slips. The record shows $13,-319.23 in drafts drawn by defendant were dishonored and charged back to his account within the period. From January 24 to January 31, 1938, the record shows that bankrupt paid the Credit Company the sum of $2,729.50, none of which was payment on the seven cars in question. From January 3 to January 22, 1938, the bank statement shows the Commercial Credit Company was paid the sum of $2,745.31. The statements (D–25 to D–31) show that many drafts were not honored by the drawee and were subsequently charged back to the account of the defendant. In the meantime, the bank had treated these deposits of drafts as cash items and had honored checks drawn against them. When the draft was charged back, the account would be overdrawn, if other funds were not deposited. Other similar drafts were then deposited to take care of those charged back. Thus the 'kiting' of drafts went on until funds were realized from the sale of some of the cars. The seven cars in question were sold and the proceeds deposited in the bank in the regular course, and the money disbursed, as shown by the cancelled

checks. The defendant traced the money received from the sale of these automobiles through the First National Bank of Delhi, Louisiana, and showed that a large part of the same was paid to the Credit Company."

Counsel for the defendant say that under these facts, "the cars belonged to Thompson and were his legally to dispose of as he saw fit * * *. Of course there was the obligation to pay back the sums advanced on the cars * * *. Failure to do so promptly was not * * * against the bankrupt act and was not a cause of bankruptcy * * *. The bankruptcy act names certain things which constitute acts of bankruptcy, and unless one of those things is charged and proved, there can be no involuntary adjudication, however much the things done may be deserving of condemnation."

The ground involved in this case is the very first one of the statute and while it does not expressly say that the defendant must be insolvent when it is committed as do those which follow, nevertheless Subsection (c) of this Section (Sec. 3), 11 U.S.C.A. § 21(c), declares that it "shall be a complete defense to any proceedings * * * under the first sub-section [sub-division] (a) of this section to allege and prove that the party proceeded against was not insolvent * * * at the time of the filing the petition against him * * * and *. * * the burden of proving solvency shall be on the alleged bankrupt." The Master found, and counsel for defendant does not appear to question its correctness, that the defendant was insolvent within the meaning of the act. The question is, do the facts bring the case within the reasonable meaning and intendment of Sec. 3(a) (1) of the Act, 11 U.S.C.A. § 21(a) (1), i. e., had the defendant "conveyed, transferred, sold or removed, or permitted to be sold or removed any part of his property with intent to hinder, delay or defraud his creditors or any of them?"

It is shown that the Commercial Credit Company of Baltimore, Maryland agreed to finance the purchase of Plymouth cars by the defendant from George Morris, Inc., wholesale dealer of Shreveport, Louisiana. The Credit Company paid cash to the wholesaler, took title in itself to the particular car or cars in each transaction and passed them on to Thompson under a "Trust Receipt," which bound him to "hold them in trust" for the Commercial Credit

Company as its property and cars, to return one or any of said cars in good order, complete and unused * * * upon demand." The Credit Company reserved the right at any time to examine the cars, books and records of the defendant, and to enter his premises for those purposes without legal process. Thompson bound himself "not to lease, rent, mortgage, pledge, encumber, operate, or use" the cars. "Dealer upon consent of Commercial Credit Company may sell said cars for cash * * and immediately after such sale dealer shall deliver from the proceeds thereof in cash the minimum sale price * * * and until such delivery shall hold the entire proceeds in trust * * * separate from the funds of the Dealer." The dealer, in each instance, executed notes for the amounts due the Commercial Credit Company for the cars.

While the trust agreement authorized the sale, apparently only for cash, in actual practice, most of the cars were sold on terms of credit, secured by chattel mortgage, and if the Credit Company thought well of the purchaser, it would discount the notes on the car by honoring the dealer's draft with them attached. However, it nevertheless held the dealer responsible for any defaults in these obligations.

■ I think a fair construction of the trust agreement and the transactions under it, is that it was intended to permit Thompson to carry on his business of a dealer in Plymouth cars with title vested in him to the extent that he could convey it to others at not less than the minimum price, on such terms as to payment of cash, trade-in value of second-hand cars, etc., as he thought advisable. This could not have been done if the Credit Company had retained title or a chattel mortgage and these had been recorded. So it entrusted the cars to Thompson under an arrangement which required the utmost good faith on his part to protect the Credit Company's interest.

■ If he sold the cars in normal course of business within the terms of his agreement, he was well within his rights. It was only when they were conveyed, "with the intent to hinder, delay or defraud" his creditors while insolvent that it became an act of bankruptcy. There can be little doubt that when he conveyed the first three cars as found by the Referee, under circumstances which clearly indicated a purpose to keep the facts concealed, and then

kept them in his place of business, allowing the agents of the Credit Company to understand that they were still his property, all until they had delivered four more cars, which he disposed of in the same way, he intended to commit a fraud. He did not have to conceal them, for the law makes it an act of bankruptcy to "convey, or transfer property under such circumstances." By mortgaging the cars and transferring the notes secured thereby, he made a species of conveyance of an interest (equitable) in them and contrary to his agreement. He also "transferred" or "conveyed" the title and property in the notes (which became his by the sale on terms of credit) to the other finance company to keep the Credit Company from applying them upon the purchase price of the cars as he had agreed to do. The result was to work a fraud upon its rights within the meaning of the Bankruptcy Act. Sec. 1(25) of the Act, 11 U.S.C.A. § 1(25); Gilbert's Collier on Bankruptcy (4th. Ed.), Secs. 117 and 118, p. 85 and authorities in foot notes.

My conclusion is that the Referee's recommendations are fully supported by the evidence and that the defendant should be adjudged a bankrupt.

Proper decree should be presented.